UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

NAHAL BATMANGHELIDJ,

Plaintiff,

- against -

THE INTERNATIONAL ACADEMY OF HOPE and THE SARAH JANE BRAIN FOUNDATION,

Defendants.

------------------------------------X

COMPLAINT

PLAINTIFF DEMANDS A TRIAL BY JURY

Plaintiff Nahal Batmanghelidj ("Batmanghelidj" or "plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants The International Academy of Hope ("iHope") and The Sarah Jane Brain Foundation ("SJBF" or, collectively, "defendants") as follows:

NATURE OF THE ACTION

1. On June 6, 2017, Batmanghelidj began working as an attorney for iHope, a non-profit school for special needs children, and its parent, SJBF. Her job was to help secure federal and state funding for children with traumatic brain injuries to receive an appropriate education. She quickly discovered, however, that iHope and SJBF were engaging in a number of improper activities, including using government funds to enrich the then Chairman and founder of both iHope and SJBF, Patrick Donohue.

2. For example, in addition to paying Donohue a $60,000 annual salary, defendants also paid $165,000 per year to The Patrick Donohue Law Firm PLLC (the "Donohue Firm") for the ostensible purpose of representing iHope students in proceedings to secure

government funding. The Donohue Firm, however, was a sham. It had no offices or employees. It listed as its "address" iHope's offices and a UPS store down the street from iHope. All of the legal "services" the Donohue Firm purportedly provided were, in fact, performed by defendants' staff using defendants' offices and resources. In other words, the Donohue Firm was a vehicle to funnel federal and state education funds to Donohue personally. Defendants also paid Donohue's nearly $8,000 monthly rent at a luxury apartment building as well as approximately $120,000 annually in deferred compensation.

3. In addition, Batmanghelidj discovered what she believed were potential violations of legal ethics requirements. The Donohue Firm purported to represent both iHope and students in legal proceedings to obtain government funding. Because the interests of iHope and the student can diverge (e.g., where counsel can secure government funding for services by education providers other than iHope), counsel typically must secure conflict waivers from the parents or guardians of the student. The Donohue Firm obtained no such waivers. Moreover, Batmanghelidj discovered that an iHope employee was holding himself out as a lawyer despite not being admitted to practice law in New York or any other state, and that defendants were knowingly allowing that employee to do so. To make matters worse, defendants had not filed appropriate paperwork, as the Appellate Division requires, and were therefore not authorized to provide legal services to students.

4. Almost as soon as she started working for defendants, Batmanghelidj began to raise these financial and ethical improprieties with senior executives including Donohue. Within days of her complaints, and only hours after recommending that defendants hire outside counsel to look into these matters, defendants placed Batmanghelidj on administrative leave. Two weeks later, defendants fired Batmanghelidj, claiming the legal

department was going in a "different direction." Batmanghelidj had worked for defendants for only 52 days.

5. Batmanghelidj brings this action for unlawful retaliation under the federal False Claims Act, the New York False Claims Act, and the New York Non-Profit Corporation Law and for breach of contract.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, the False Claims Act, 31 U.S.C. § 3729 et seq.

7. This Court also has supplemental jurisdiction over plaintiff's claim under the New York False Claims Act pursuant to 31 U.S.C. § 3732(b) and jurisdiction over plaintiff's New York False Claims Act claim, New York Non-Profit Corporation Law claim, and breach of contract claim pursuant to 28 U.S.C. § 1367 because those claims closely relate to the federal False Claims Act claim, having arisen out of the same transactions and occurrences and sharing a common nucleus of operative facts, such that these claims and the federal False Claims Act claim form part of the same case or controversy.

8. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this judicial district.

## THE PARTIES

9. Batmanghelidj is a citizen of New York State who worked for defendants from June 6, 2017, until her employment was terminated on July 28, 2017.

10. SJBF is a non-profit corporation registered in New York, with its primary place of business in New York, New York. During the relevant time period, SJBF employed more than 20 employees.

11. iHope is a non-profit corporation registered in New York, with its primary place of business in New York, New York. During the relevant time period, iHope employed more than 20 employees. iHope is a wholly owned subsidiary of SJBF.

12. At all times relevant to this litigation, plaintiff was defendants' employee within the meaning of the federal False Claims Act and the New York False Claims Act.

Background

13. Batmanghelidj is an experienced attorney who practiced extensively in the area of children with disabilities and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

14. Batmanghelidj graduated from Middlebury College with a Bachelor of Arts in 2002 and then from Brooklyn Law School in 2008.

15. Following law school, Batmanghelidj joined the New York County District Attorney's Office as an Assistant District Attorney, where she worked for more than five years. In that position she investigated and prosecuted hundreds of cases including conducting a number of trials.

16. In 2014, Batmanghelidj moved to the New York City Department of Education ("DOE") where she served as an Agency Attorney within the Special Education Unit. Batmanghelidj investigated due process complaints filed with the DOE alleging a failure to provide an education that meets the requirements of the IDEA. She also litigated complex special education cases; provided guidance and legal advice to DOE employees; and negotiated settlement contracts and facilitated settlements between the DOE and families seeking funds under the IDEA.

17. After two and a half years at the DOE, Batmanghelidj started working for the New York City Department of Investigation in 2016. As Deputy Inspector General, Batmanghelidj supervised investigations into sex crimes committed by corrections officers against inmates within the New York City Department of Correction.

18. On June 6, 2017, Batmanghelidj started working for iHope as Legal Director.

19. Although Batmanghelidj's employment contract was with iHope, SJBF was also her employer by virtue of the total control SJBF had over iHope. On information and belief, SJBF and iHope acted as a single employer.

20. For example, iHope and SJBF shared employees, including senior executives, who had the same titles and performed the same responsibilities across both organizations.

21. Indeed, the boards of iHope and SJBF had the same directors and made the same decisions, such as approving iHope's by-laws and determining the titles of senior executives.

22. SJBF ignored the corporate form by treating iHope's revenues and expenses as its own. SJBF also took out malpractice insurance that purportedly covered the activities of iHope without identifying iHope as a separate legal entity.

23. During negotiations and discussions about Batmanghelidj's job responsibilities, defendants told Batmanghelidj that she would be responsible for the legal representation of current and prospective students, thereby allowing Donohue to focus on fundraising. She would also be charged with assisting in the expansion of iHope within and

beyond New York. Defendants promised Batmanghelidj that she would have significant control over her role and responsibilities.

The IDEA and Defendants' Funding Model

24. iHope is a private institution that provides educational services to children with traumatic brain injuries. It currently serves approximately 50 students.

25. SJBF is a non-profit foundation with the ostensible purpose of developing standards of care for children with traumatic brain injuries. It is the parent of iHope and effectively controls iHope.

26. Defendants derive almost all of their revenue from federal and state funds. In 2016, most of defendants' revenue came from such government funding.

27. Under the IDEA, a child with disabilities is entitled to a Free Appropriate Public Education ("FAPE"). Where the DOE has failed to provide a FAPE, the federal and state governments allocate funds to cover that child's placement in a private institution that can provide an appropriate education.

28. The federal government funds states to provide such education and the states, in turn, determine whether a FAPE is available for a child and, if not, how much money to provide to that child's family in order for the child to receive an appropriate education at a private institution. In addition, New York State contributes funds above those the federal government provides.

29. The federal and state governments also provide supplemental funds where additional services are required for the child. For example, if a child needs the services of a particular specialist that is not available at her school, supplemental government funds may be

available to pay for the specialist. Alternatively, the child can seek a placement at a different institution that employs the necessary specialist.

30. In accepting IDEA funds, defendants impliedly certify that they are compliant with all relevant laws and regulations, including those concerning the governance of non-profit corporations and the use of those government funds. Compliance with those laws and regulations is a material requirement in the government's decision to provide funds under the IDEA and a failure to disclose violations is misleading and fraudulent.

Laws Governing Non-Profit Corporations in New York

31. In the last decade, in the wake of several scandals involving non-profit corporations, New York strengthened its laws and regulations applicable to non-profit corporations.

32. In 2013, New York amended its Not-for-Profit Corporation Law through the Non-Profit Revitalization Act of 2013 ("NPRA"). The NPRA was designed to restore public trust in non-profit corporations by improving their governance and preventing fraud.

33. Among the many changes it implemented, the NPRA restricted a non-profit corporation's ability to enter into a financial transaction where a board member or other senior employee has a financial interest in one of the parties to that transaction. Under the new statutory scheme, a non-profit may enter into such a "related party transaction" only where its board of directors or a committee authorized by the board of directors (1) "consider[s] alternative transactions to the extent available"; (2) "[a]pprove[s] the transaction by not less than a majority vote"; and (3) "[c]ontemporaneously document[s] in writing the basis for the board or authorized committee's approval, including its consideration of any alternative transactions."

34. The NPRA also created a requirement that all non-profit corporations with more than 20 employees and an annual revenue that exceeds $1,000,000 have a Whistleblower Policy that protects from retaliation individuals who report violations of law and company policies.

35. Separately from the NPRA, Governor Andrew Cuomo in 2012 issued Executive Order 38, which limits the compensation that non-profit corporations can pay to executives. Executive Order 38 was designed to combat the widespread use of government funds to enrich senior executives of non-profits through excessive compensation.

36. Executive Order 38 and its implementing regulations require that any non-profit, such as iHope, that receives more than $500,000 and 30% of its revenue from the state government cannot pay any employee a salary of more than $199,000.

<u>Ethical Rules Governing the Practice of Law in New York</u>

37. The practice of law in New York is governed by the New York Rules of Professional Conduct.

38. Under the Rules of Professional Conduct, a conflict of interest arises when a lawyer represents two or more clients that have differing interests. A lawyer may nevertheless represent those clients so long as each client agrees, in writing, to waive any objections.

39. The Rules of Professional Conduct also prohibit a lawyer from engaging in the unauthorized practice of law and aiding the unauthorized practice of law.

<u>Batmanghelidj Discovers Potential Fraud and Self-Dealing at Defendants</u>

40. As soon as Batmanghelidj started working for defendants, she became concerned about their practices. In particular, it became apparent to Batmanghelidj that defendants funneled funds to Donohue for his personal benefit.

41. In her first week of employment, Batmanghelidj noticed that legal filings were submitted in the name of the Donohue Firm, even though she was employed by defendants. Batmanghelidj discovered that defendants had an arrangement to pay the Donohue Firm to handle IDEA applications and appeals on behalf of current and prospective students.

42. On information and belief, the Donohue Firm has no offices and no employees other than Donohue. All of the work the Donohue Firm performed on behalf of iHope's students was done by iHope-employed attorneys (such as Batmanghelidj) and other iHope staff using iHope's offices and resources, during iHope's business hours. The Donohue Firm alternatively listed iHope or a UPS store near iHope's offices as its own address when filing legal papers.

43. Nonetheless, Batmanghelidj learned that in addition to paying Donohue an annual $60,000 salary and additional six-figure deferred compensation, defendants also paid the Donohue Firm $165,000 annually.

44. On information and belief, the iHope and SJBF Boards of Directors (the "Boards") both agreed to this related party transaction on the basis of false and misleading information from Donohue. The Boards were presented with a cost-benefit analysis claiming that competing law firms could charge over $1,000 per hour for IDEA work. In fact, even the most experienced law firm does not charge more than $650 per hour for such work and typically charges much less. Moreover, unlike the Donohue Firm, even the most highly-compensated IDEA firms pay their own overhead expenses, such as rent and salaries.

45. The Boards' failure to consider plausible alternative transactions for securing representation of iHope's current and prospective students potentially violated the New York Non-Profit Corporation Law's restrictions on related party transactions.

46. In addition to profiting from defendants through a salary and the financial arrangement with the Donohue Firm, Donohue obtained housing payments from defendants. Defendants paid Donohue's apartment complex approximately $7,800 per month to cover Donohue's rent.

47. Defendants also paid Donohue approximately $120,000 per year in deferred compensation. This amount purportedly reflected work that Donohue had performed for defendants in previous years but for which he had allegedly not been compensated.

48. Batmanghelidj calculated that Donohue earned from defendants over $300,000 per year, including the value of those related transactions. This compensation violates New York Executive Order 38 and its implementing regulations, which limit compensation of executives of a non-profit institution to no more than $199,000 if that non-profit organization receives more than $500,000 and 30% of its revenue from the state government.[1]

Batmanghelidj Discovers Potential Legal Ethical Violations

49. Batmanghelidj also uncovered three serious ethical problems that she reasonably believed violated the New York Rules of Professional Conduct, one of which also violated the New York Judiciary Law.

50. First, she learned that an iHope employee was holding himself out as a lawyer despite not being admitted to the New York bar.

51. Before joining defendants in 2016, this employee had been a paralegal in the Special Education Unit of the DOE, where Batmanghelidj had worked. He graduated from law school in 2012 but was not admitted to practice law in New York. On information and belief, this employee was not admitted to practice law in any state.

[1] Documents recently filed by defendants show that, in 2016, they provided Donohue with compensation totaling almost $400,000.

52. On information and belief, this employee held himself out as a lawyer to parents of children at iHope and those parents understood him to be a lawyer.

53. Batmanghelidj heard this employee describe himself as an attorney to defendants' staff on at least one occasion.

54. This employee was also listed in Batmanghelidj's initial employment contract as Director of Regulatory/Legal Affairs. Batmanghelidj heard this employee use this title in conversation. This employee was also listed as "Legal Counsel" in minutes of meetings of the Boards.

55. In addition, defendants included this employee on SJBF's legal malpractice insurance as a lawyer.

56. Donohue was aware that this employee was not an admitted attorney but nevertheless did not prevent this employee from holding himself out as an attorney.

57. Second, Batmanghelidj became aware of the conflict of interest associated with having the same attorneys represent both iHope and current and prospective iHope students.

58. The joint representation of iHope and its students could have presented a conflict of interest because it was possible for the interests of the child and the interests of iHope to diverge. For example, the DOE will sometimes attempt to settle a dispute over IDEA funds by agreeing to fund partially a child's tuition. Although this might be the best outcome for the child, defendants had an incentive to reject such a settlement and challenge the DOE's denial of funds in the hopes of obtaining full funding, thereby maximizing revenue.

59. Despite this conflict of interest, Donohue said he did not have parents of the represented children sign any retainer that notified parents of the possibility of conflicts or that authorized a waiver of those conflicts.

60. Third, under the New York Judiciary Law, a non-profit corporation cannot provide legal counsel to others unless it submits paperwork to the Appellate Division disclosing, among other things, the type of legal services being performed and the names and addresses of any attorneys who will perform those legal services.

61. Batmanghelidj learned that defendants had not filed the proper paperwork with the Appellate Division.

62. Accordingly, she formed the belief that the legal work that defendants performed would constitute the unauthorized practice of law under the New York Judiciary Law and the New York Rules of Professional Conduct.

Batmanghelidj Raises Her Concerns with Senior Personnel

63. Batmanghelidj raised questions about the potential fraud and ethical violations discussed above almost as soon as she started working for defendants.

64. Within the first week of starting at defendants, Batmanghelidj told Donohue her concerns about performing work under the auspices of the Donohue Firm and about the lack of conflict waivers. Batmanghelidj requested and received permission from Donohue to discuss the conflict of interest problems with pro bono counsel.

65. In or around mid-June 2017, Batmanghelidj contacted pro bono counsel and explained her concerns about the lack of conflict waivers.

66. Following those conversations, Batmanghelidj became convinced that the lack of conflict waivers and the failure to file the appropriate paperwork with the Appellate Division created an ethical violation. She also became concerned about defendants allowing the unauthorized practice of law by an iHope employee.

67. Within the first few weeks of starting work at defendants, Batmanghelidj also learned of Donohue's excessive compensation and self-dealing and expressed her concern about this to the President of iHope and SJBF, Vincent Massaro ("Massaro"), who was also treasurer of the Boards. In particular, Batmanghelidj mentioned the payment to the Donohue Firm and the conflicts created by this arrangement as well as Donohue's use of defendants' funds for personal expenses.

68. Massaro told Batmanghelidj that ever since she had started at defendants, he had been "nervous" that she would start asking about the propriety of these transactions but that he was relieved that she was raising these issues.

69. However, when Batmanghelidj proposed speaking with Donohue about the problematic financial arrangements, Massaro asked Batmanghelidj to hold off because Donohue could be irrational.

70. Batmanghelidj understood Massaro to be warning her that Donohue might retaliate against her for raising these concerns.

71. Despite Massaro's warning, Batmanghelidj believed that she needed to discuss these issues with Donohue.

72. Batmanghelidj met with Donohue and reiterated her concerns about defendants' decision to retain the Donohue Firm and Donohue's compensation. She also raised her concern about an employee falsely holding himself out as a lawyer. Donohue dismissed Batmanghelidj's concerns. However, Donohue admitted that he received compensation through the Donohue Firm in addition to his $60,000 salary.

73. Several days after this meeting, Batmanghelidj met with Paul Juhasz ("Juhasz"), Chief Administrative Officer of iHope and SJBF, to discuss the same issues. Juhasz

said that defendants would work to fix these problems but denied that these problems were intentional.

Batmanghelidj Seeks Outside Counsel and Defendants Fire Batmanghelidj in Retaliation

74. After meeting with Massaro, Juhasz, and Donohue, Batmanghelidj decided to speak with an outside attorney specializing in non-profit law that defendants could retain to resolve the problems she had identified.

75. On or about July 11, 2017, Batmanghelidj spoke with outside counsel.

76. Following Batmanghelidj's call, she requested a meeting with, inter alia, outside counsel, Donohue, Juhasz, and Massaro to discuss the operation of defendants, including the potential fraud and ethical violations she had previously raised.

77. On July 14, 2017, senior personnel of defendants, including Donohue, Batmanghelidj, Juhasz, and Massaro, met with outside counsel.

78. Following the meeting, Juhasz asked Batmanghelidj to prepare a memo to the iHope board to justify retaining outside counsel, which Batmanghelidj prepared and submitted to Juhasz.

79. On July 17, 2017, Batmanghelidj sent another email recommending that defendants retain outside counsel specializing in legal ethics.

80. Just hours after Batmanghelidj sent this email, Juhasz called Batmanghelidj into a meeting with him and Massaro. Juhasz told Batmanghelidj that her relationship with Donohue was strained and he was concerned about conflicts of interest because she is a lawyer.

81. Juhasz then placed Batmanghelidj on two weeks of paid leave. Juhasz told Batmanghelidj that after two weeks she could return with a "clean slate," but she was not to speak with anyone regarding defendants during the leave.

82. About one week into the two-week leave period, Batmanghelidj emailed Juhasz and Massaro to confirm that she would return to work on July 31, 2017 and was told that they would call her in a few days to discuss the details of her return.

83. On July 28, 2017, defendants fired Batmanghelidj.

84. In a phone call, Juhasz told Batmanghelidj that defendants planned to take the legal unit in a "different direction" and that firing her was best for her and for defendants.

85. Defendants agreed to pay Batmanghelidj's salary for an additional month through two installments. Defendants paid Batmanghelidj only the first installment.

86. By letter dated August 15, 2017, Batmanghelidj asserted whistleblower claims against iHope.

87. Defendants retaliated further against Batmanghelidj by not paying her the second installment of her additional month of salary.

FIRST CAUSE OF ACTION

Retaliation Under the False Claims Act

88. Plaintiff repeats and realleges paragraphs 1 to 87 above.

89. By virtue of the acts described above, defendants violated 31 U.S.C. § 3730(h) by terminating plaintiff's employment because of lawful acts she undertook in furtherance of an action under the False Claims Act, including initiating, participating in, and disclosing an investigation of potential False Claims Act violations, in the reasonable belief that

defendants' actions could constitute a violation of obligations impliedly certified as a condition of receiving government funds.

90. Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

91. As a result of defendants' retaliatory actions, plaintiff suffered and continues to suffer substantial damages, including damages for emotional distress and humiliation.

## SECOND CAUSE OF ACTION

### Retaliation Under the New York False Claims Act

92. Plaintiff repeats and realleges paragraphs 1 to 91 above.

93. By virtue of the acts described above, defendants violated N.Y. State Fin. Law § 191 by terminating plaintiff's employment because of lawful acts she undertook in furtherance of an action under the New York False Claims Act, including initiating, participating in, and disclosing an investigation of potential New York False Claims Act violations, in the reasonable belief that defendants' actions could constitute a violation of obligations impliedly certified as a condition of receiving government funds.

94. Defendants engaged in retaliatory actions with wanton negligence and reckless indifference to plaintiff's statutory rights.

95. As a result of defendants' retaliatory actions, plaintiff suffered and continues to suffer substantial damages, including damages for emotional distress and humiliation.

THIRD CAUSE OF ACTION

The New York Non-Profit Revitalization Act of 2013 – Failure To Have Whistleblower Policy And Retaliation

96. Plaintiff repeats and realleges paragraphs 1 to 95 above.

97. Pursuant to New York Not-for-Profit Corporation Law § 715-b, as non-profit organizations with more than 20 employees and an annual revenue that exceeds $1,000,000, defendants are required to have a Whistleblower Policy that complies with the statute.

98. The Whistleblower Policy required by the New York Not-for-Profit Corporation Law must provide that no director, officer, employee or volunteer who in good faith reports any action or suspected action taken by or within the organization that is illegal, fraudulent, or in violation of any policy of the organization shall suffer intimidation, harassment, discrimination, or other retaliation or, in the case of employees, adverse employment consequences.

99. The Whistleblower Policy must include (a) procedures (including confidentiality provisions) for reporting violations or suspected violations of laws or organization policies; (b) a requirement that an employee, officer or director be designated to administer the Policy and report to the Audit Committee, another committee of independent directors or the Board; and (c) a requirement that a copy of the Policy be distributed to all directors, officers, employees, and volunteers who provide substantial services to the organization.

100. Plaintiff had a good faith belief that Donohue engaged in conduct that was fraudulent and in violation of the law and defendants' policies.

101. Plaintiff reported Donohue's misconduct to her supervisors.

102. Defendants did not have a Whistleblower Policy. Moreover, defendants failed meaningfully to respond to plaintiff's complaints and did not present them to an Audit Committee, another committee of independent directors, or to the Boards.

103. After plaintiff complained about Donohue's actions, defendants retaliated against plaintiff by placing her on paid leave, firing her, and withholding her severance pay.

104. Defendants engaged in their retaliatory actions with wanton negligence and reckless indifference to plaintiff's statutory rights.

105. Plaintiff is now suffering and will continue to suffer monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

FOURTH CAUSE OF ACTION

Breach of Contract

106. Plaintiff repeats and realleges paragraphs 1 to 105 above.

107. Plaintiff and defendants formed a contract when defendants hired plaintiff as an attorney to perform legal services. SJBF is a party to the contract by virtue of its control over iHope, which it exercises for its own benefit.

108. The parties intended to be bound by the contract.

109. This contract contained an implied obligation that plaintiff act in accordance with her ethical obligations as a lawyer.

110. By the acts and practices described above, defendants breached the contract by firing plaintiff in retaliation for her complaining about defendants' violations of legal ethics.

111. As a result of defendants' actions, plaintiff has suffered and will continue to suffer compensable damages unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) Declaring that defendants violated the federal False Claims Act, the New York False Claims Act, the Not-for-Profit Corporation Law, and state common law;

(b) Enjoining and permanently restraining defendants from violating the federal False Claims Act, the New York False Claims Act, and the Not-for-Profit Corporation Law;

(c) Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) Directing defendants to reinstate plaintiff;

(e) Directing defendants to place plaintiff in the position she would have occupied but for defendants' retaliatory and otherwise unlawful conduct and making her whole for all earnings and other benefits she would have received but for defendants' retaliatory and unlawful treatment, including, but not limited to, wages and other lost benefits;

(f) Directing defendants to pay plaintiff two times backpay plus interest pursuant to the federal False Claims Act and the New York False Claims Act;

(g) Directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and damage to reputation, including her professional reputation;

(h) Directing defendants to pay plaintiff punitive damages;

(i) Directing defendants to pay plaintiff's attorneys' fees and costs;

  (j) Directing defendants to compensate plaintiff for any adverse tax consequences of a lump sum damage payment;

(k) Directing defendants to pay prejudgment interest; and

(l) Granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
July 20, 2018

VLADECK, RASKIN & CLARK, P.C.

By: ______________________

Debra L. Raskin
Valdi Licul
Joshua Tarrant-Windt
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300